UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| OPTIM LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 4:23-cv-40014-MRG |
| | ) |
| FREEMAN MANUFACTURING LLC, | ) |
| | ) |
| Defendant. | ) |

**ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 32)**

**GUZMAN, J.**

Plaintiff Optim LLC ("Optim") brought this action against Defendant Freeman Manufacturing LLC ("Freeman") to recover damages caused by Freeman's sale of allegedly defective plastic sheathing used by Optim to create medical insertion tubes. The basis of Optim's complaint is that Freeman manufactured products that it knew or should have known were not suitable for painting numbering and markings onto them and in doing so breached various contractual obligations including express and implied warranties, in addition to making actionable misrepresentations. Presently before the Court is the Plaintiff's Motion for Summary Judgment Counts I to VI. [ECF No. 32]. For the reasons stated below, Plaintiff's motion for summary judgment is **GRANTED IN PART and DENIED IN PART**.

**I.     BACKGROUND**[1]

Optim is a Delaware company that manufactures medical devices, among other products, in Massachusetts. [Def.'s Resp. to Pl.'s Statement of Facts ("RSOF") ¶ 1, ECF No. 48]. Optim

---

[1] The following facts are as set forth in the record and are undisputed except as noted. The Court takes note of the fact that Freeman relies on ninety-five documents that were untimely produced after the present motion for summary judgment was filed. [ECF No. 50 at 13-14]. Freeman produced no justification, and the disclosure cannot be said to

hired Freeman to manufacture black plastic sheathing, which Optim later used to create the X-7 tube, a transesophageal echocardiogram medical insertion tube. [Id. ¶ 2]. Freeman manufactures the sheathing of the tube by "melting plastic pellets made of Lubrizol polyurethane, called Pellethane, drying that material and then extruding the material into sheathing." [Id. ¶ 6]. Optim would then obtain the sheathing from Freeman and begin its own manufacturing process, combining components into the X-7 tube. [Id. ¶ 7]. The X-7 tube would then be sent to a painting contractor that would paint hash marks and numbers on the sheathing's exterior. [Id.] Optim sells these X-7 tubes to a third-party, Philips, who creates a device used by physicians to assess the human heart. [Id. ¶¶ 3-4]. Physicians insert the tube into the human body, through the mouth to transmit images of the heart. [Id. ¶ 5].

From 2008 through October 2022, all the X-7 tubes manufactured at Optim were made with sheathing manufactured by Freeman. [Id. ¶ 9]. Optim acquired these sheathings by submitting purchase orders to Freeman. [Id. ¶ 10]. These purchase orders contained "the quantity of sheathing ordered from Freeman, total costs, and standard terms and conditions. [Id. ¶ 12]. In February 2021, Optim began issuing purchase order forms which contained the following warranty provision:

> In addition to all other express or implied warranties, seller represents and warrants that any materials ( including packaging) provided under this purchase order shall: (1) conform to the description in the purchase order; (2) be free from defects in materials and/or workmanship; (3) conform to buyer's instructions, specifications, drawings and data; (4) be merchantable; (5) be free from defects in design and be fit for the purpose intended; and (6) conform to all warranties, express or implied by law. Seller warrants all materials furnished and/or installed hereunder to be new and not used or reconditioned (unless otherwise specified in this purchase order). Seller warrants that it will perform this purchase order with the degree of skill and judgment which is normally exercised by recognized firms with respect to materials

---

be harmless, particularly at this stage. See Eldridge v. Gordon Bros. Grp., L.L.C., 863 F.3d 66, 85 (1st Cir. 2017) (explaining that the party facing sanctions has "the burden of proving substantial justification or harmlessness to get a penalty less severe than evidence preclusion"). Indeed, Optim did not have the benefit of that discovery before it filed its motion for summary judgment. Accordingly, pursuant to Federal Rule of Civil Procedure 37(c)(1), the required sanction in this case is mandatory preclusion of the untimely produced evidence. See also Harriman v. Hancock Cnty., 627 F.3d 22, 30 (1st Cir. 2010) ("Rule 37 authorizes district courts to sanction noncomplying parties . . . the required sanction in the ordinary case is mandatory preclusion." (cleaned up)).

of a similar nature, and this will be provided in a good, competent and workmanlike manner. These warranties, and all other warranties, express or implied, shall survive delivery, inspection, acceptance and payment.

[Id. ¶ 13]. Optim's purchase orders also contained terms stating that acceptance of the purchase order was expressly limited to the terms and conditions of the purchase order. [Id. ¶ 24]. These purchase orders also articulated that:

Acceptance of the materials covered by this purchase order will not constitute acceptance by buyer of seller's terms and conditions. Any of the following acts by seller will constitute acceptance of this purchase order and all of its terms and conditions: signing and returning a copy of this purchase order, delivering any of the materials ordered, commencing performance or informing the buyer in any manner of commencement of performance, or returning seller's own form of acknowledgement.

[Id. ¶ 26]. Freeman would respond to the purchase orders by shipping the products along with its own invoices and warranty disclaimers. [Id. ¶ 17]. One of the disclaimers stated that "Freeman Mfg. is not liable and does not guarantee yield, quality or any production of any material on this order." [Id. ¶ 19]. Freeman also provided Optim with a Certificate of Compliance during their shipments of sheathing that stated:

This is to certify that the material furnished has been manufactured, inspected and tested in accordance with the Freeman Manufacturing's procedures and meets all of the customer specifications and related documents.

[Id. ¶ 15].

In January 2022, Philips notified Optim that over 400 tubes in its inventory were defective because painted numbers and markings would fall of the tubes. [Id. ¶ 28].[2] These defective tubes were manufactured at Optim with all the sheathing for the tubes being received from Freeman. [Id.

---

[2] Embedded within Defendant's Responses to Optim's Statement of Material Facts, Freeman moves to strike several paragraphs, including the evidence cited therein, on grounds of inadmissible hearsay, opinion evidence, or incorrect information. E.g., [RSOF ¶¶ 28-29, 31, 40-42]. That matter should have been addressed by separate motion pursuant to Local Rule 7.1. See Schuster v. Wynn Resorts Holdings, LLC, No. 19-cv-11679-ADB, 2023 WL 2248886, at *12 (D. Mass. Feb. 27, 2023) (holding that request to strike in a footnote was procedurally improper because "[p]ursuant to Local Rule 7.1., [p]laintiff was required to file a separate motion to strike"). To the extent there is a material factual dispute, the Court will address that matter in the discussion section below.

¶ 29]. These sheathings were obtained by Optim through eight purchase orders dated from March 2021 through August 2022. [Id. ¶¶ 31-32]. Philips ultimately returned the defective tubes that Optim spent time and labor manufacturing. [Id. ¶¶ 33-34]. As a result of the defects, Optim and Philips began conducting a root cause analysis, where they employed a "double-tape test" which consisted of applying tape to the painted number to determine if such numbers and paintings were properly adhered. [Id. ¶ 38]. Optim acquired additional costs to perform these tests, as well as paying the engineers who were conducting the tests. [Id. ¶¶ 40-42]. The tests revealed a "failure rate of approximately 30%-50%" of the Freeman sheathing. [Id. ¶ 40]. The analysis shifted focus to Freeman's sheathing after Optim was informed by Freeman that it had to suspend shipping due to the material being "too wet." [Id. ¶ 45].

Specifically, Freeman informed Optim that it could not continue to ship any product to Optim because its dryer was not operating correctly. [Id. ¶¶ 46-47]. Freeman complained of multiple ongoing issues going on with the dryer based on the material in the dryer being wet and not drying. [Id. ¶ 61]. Freeman specifically identified issues with the wiring, the dew meter, the drying agent inside the dryer, the heater relay, the main timer relay, the Thermo switch, the temperature readings, and the fan. [Id. ¶¶ 61-62, 64, 68]. Freeman disputes that these issues with the dryer ever existed when Freeman manufactured any product that was shipped to Optim. [Id. ¶ 48].

Optim also discovered that Freeman was not in compliance with the instructions provided in a document titled "Drying of Medical Grade Thermoplastic Polyurethanes. [Id. ¶ 48]. Specifically, Freeman did not measure the dew point of the sheathing while it was in the dryer, the dew point of the dryer was at a different temperature than required, Freeman did not maintain the necessary air humidity, and did not verify the moisture level of the sheathing. [Id. ¶¶ 49-55].

Freeman had been manufacturing sheathing using Pellethane for about fifteen years. [Id. ¶ 56]. Based on all this information, Optim alleges, and Freeman disputes, that the cause of the painting not adhering to the sheathing was caused by Freeman's dryer failure. [Id. ¶ 83].

## II.   LEGAL STANDARDS

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must therefore demonstrate that "there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The burden then shifts "to the nonmovant to establish the existence of at least one fact issue which is both 'genuine' and 'material.'" Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (collecting cases). The nonmovant "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

A genuine issue exists when the evidence permits "a rational factfinder to resolve the issue in favor of either side." Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995). In other words, there must be "sufficient evidence supporting the claimed factual dispute ... to require a jury or judge to resolve the parties' differing version of the truth at trial." Hahn v. Sargent, 523 F.2d 461, 464 (1st Cir. 1975) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)). A material fact is "one that has the potential of affecting the outcome of the case." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004) (citing Anderson, 477 U.S. at 248-50). Summary judgment must be denied "when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant[.]" Parrilla-Burgos v. Hernandez-Rivera, 108 F.3d 445, 448 (1st Cir. 1997).

5

"Local Rule 56.1 was adopted to expedite the process of determining which facts are genuinely in dispute, so that the court may turn quickly to the usually more difficult task of determining whether the disputed issues are material." Butters v. Wells Fargo Advisors, LLC, No. 10-10072-MLW, 2012 WL 5959986, at *2-3 (D. Mass. Nov. 27, 2012) (quoting Brown v. Armstrong, 957 F. Supp. 1293, 1297 (D. Mass.), aff'd, 129 F.3d 1252 (1st Cir. 1997)). The non-moving party must state the specific facts that are disputed which prevent the granting of summary judgment. Brown, 957 F. Supp. at 1297 (citing Vasapolli v. Rostoff, 864 F. Supp. 215, 218 (D. Mass. 1993), aff'd, 39 F.3d 27 (1st Cir. 1994)). The nonmovant must "go beyond merely asserting the existence of a disputed and material fact[,]" and produce evidence that "substantially proves the existence of such a disputed fact." Lucia v. Prospect St. High Income Portfolio, Inc., No. 90-10781-MA, 1993 WL 761409, at *5 (D. Mass. Aug. 26, 1993) (citing Sheinkopf v. Stone, 927 F.2d 1259, 1262 (1st Cir. 1991)).

In analyzing motions for summary judgment, all reasonable inferences are drawn in favor of the nonmoving party. Gattineri v. Wynn MA, LLC, 63 F.4th 71, 85 (1st Cir. 2023) (quoting Doe v. Tr. of Bos. Coll., 892 F.3d 67, 79 (1st Cir. 2018)). Parties may not rely on "conclusory allegations or substantiated denials" and must take facts "derived from the pleadings, depositions, answers to interrogatories, admissions and affidavits to demonstrate either the existence or absence of an issue of fact." Magee v. United States, 121 F.3d 1, 3 (1st Cir. 1997) (citing Fed. R. Civ. P. 56(c) & (e)). In any event, if there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party[,]" the Court will deny the motion. Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir. 2002) (quoting Anderson, 477 U.S. at 249). Otherwise, the motion should be granted.

### III.  DISCUSSION

#### A.  Breach of Contract

Optim's breach of contract claim presents the first issue before the Court. Optim seeks "summary judgment on its breach of contract claim for Freeman's delivery of defective sheathing in breach of the Purchase Orders." [ECF No. 35 at 10]. Freeman does not dispute the existence of a contract or delivery, but rather argues that the purchase orders did not form the contract between the parties. [ECF No. 47 at 5-11]. Instead, Freeman argues that the parties' "course of dealing" controls the contractual terms. [Id. at 5-7]. As a preliminary matter, the Court must first settle this "fundamental dispute regarding the character of the parties' alleged contract, around which all claims turn." See Softub, Inc. v. Mundial, Inc., 53 F. Supp. 3d 235, 248 (D. Mass. 2014); see also Ionics, Inc. v. Elmwood Sensors, Inc., 110 F.3d 184, 187 (1st Cir. 1997) ("We face . . . a battle of the forms. This is purely a question of law.").

##### 1.  *Terms of Contract*

The main challenge presented by Freeman in this case is that there is no clear written contract governing the parties' relationship. Optim takes the position that its agreement with Freeman is governed by the terms and conditions contained in its purchase orders. Freeman argues that such term and conditions, introduced multiple years after the parties had been engaged in a relationship, cannot form the basis of the agreement, especially considering the opposing language Freeman presented in its invoices. The terms contained in Freeman's invoices conflict with the terms contained in Optim's purchase orders. Therefore, this case is a classic "'battle of the forms' sale, in which a buyer and a seller each attempt to consummate a commercial transaction through the exchange of self-serving preprinted forms that clash, and contradict each other, on both material and minor terms." Com. & Indus. Ins. v. Bayer Corp., 742 N.E.2d 567, 571 (Mass. 2001).

Freeman first argues that between 2013 and 2021, the Parties engaged in a contractual relationship in which their communications established a contract. [ECF No. 47 at 8-9]. Clearly put, Freeman states that the parties' course of dealing should dictate the terms of the contract between the parties. [Id.] Accordingly, Freeman argues that any changes made through a purchase order were improper and should be ignored by this Court. [Id.] Freeman cites no cases, and this Court is aware of none, that support his argument. Instead, Massachusetts courts have found that "changes in [a] purchase order, inserting express warranty terms, undercut the parties' prior course of dealing and render[] the invoices' . . . a material alteration to [the] purchase order and, accordingly, unenforceable." Borden Chem., Inc. v. Jahn Foundry Corp., 834 N.E.2d 1227, 1230 (Mass. App. Ct. 2005). Therefore, the parties' prior relationship does not hold weight, considering Optim's new purchase orders dictate the contractual relationship of the parties.

Freeman also argues that even if Optim's purchase orders are considered by this Court, the terms should still be ignored because Freeman did not assent to these new terms and its invoices contain contradicting terms. [ECF No. 47 at 9-11]. When parties have contradicting terms in their forms, UCC § 2–207, enacted as Mass. Gen. Laws ch. 106, § 2–207, governs. See JOM, Inc. v. Adell Plastics, Inc., 193F.3d 47, 52 (1st Cir. 1999). Starting with § 2–207(1), as explained in JOM, Inc., "if the parties exchange forms with divergent terms, yet the seller's invoice does not state that its acceptance is made 'expressly conditional' on the buyer's assent to any additional or different terms in the invoice, a contract is formed, and its precise terms are determined through recourse to the three-part test in § 2–207(2)." [Id. at 53 (emphasis added)]. This is the case here because Freeman's invoices did not "expressly condition" its terms on the buyer's assent. [See ECF No. 33-11].

8

Accordingly, a contract is formed, and the Court must apply the three-part test in § 2–207(2) to determine which terms control. This section provides that:

> The additional or different terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
>
> (a) the offer expressly limits acceptance to the terms of the offer;
> (b) they materially alter it; or
> (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

Mass. Gen. Laws ch. 106, § 2–207. Here, Optim's purchase order "expressly limits acceptance to the terms of the offer" as contemplated in § 2–207(2)(a). Specifically, Optim's purchase orders provide terms and conditions that, in part, state:

> **Acceptance of Purchase Order:** Acceptance of this purchase order by seller is expressly limited to the terms and conditions contained in this purchase order. Any term of condition stated by the seller in any prior proposal, on Seller's acknowledgement form, or in otherwise acknowledging or accepting this purchase order is deemed by buyer to be a material alteration of this purchase order and is hereby rejected unless buyer specifically agrees otherwise in writing.

[ECF No. 33-9 at 2]. Under subsection § 2–207(2)(a), additional terms in an acceptance or confirmation, here Freeman's invoices, do not become part of the contract because Optim's purchase orders explicitly limited such terms. Accordingly, as a matter of law, a contract was formed under § 2–207(1) and its terms are limited to the terms of Optim's purchase order under § 2–207(2)(a).

### 2. *Breach of Contract (Count I)*

Having concluded that the plain language of the purchase orders governs the contract between Optim and Freeman, Optim argues that it is entitled to summary judgment because Freeman breached its contract. To sustain a cause of action for breach of contract of contract under Massachusetts law, plaintiffs must plead: (1) that the parties had an agreement supported by valid consideration; (2) that plaintiffs were ready, willing and able to perform; (3) that defendant's breach has prevented them from performing; and (4) that plaintiffs were damaged. Doyle v.

9

Hasbro, Inc., 103 F.3d 186, 194 (1st Cir. 1996) (citing Singarella v. City of Boston, 173 N.E.2d 290, 291 (1961)). Here, there is no dispute that there was a valid contract present but the parties dispute whether there was a breach, namely a "defect."

Optim argues that the breach occurred when Freeman provided Optim with sheathing that "suffered from a manufacturing defect which caused painted numbers and hash marks to literally fall off the Optim tubes[.]" [ECF No. 35 at 10-11]. Freeman argues that it "did not produce or sell any 'defective sheathing' "and that any sheathing that it provided complied "with any specifications issued by Optim." [RSOF ¶ 40]. Whether or not paint falling off is a defect is a factual question that can be determined by a jury based on the present evidence. See Marcus v. City of Newton, No. 9610, 2000 WL 121783, at *1 (Mass. Dist. Ct. Jan. 25, 2000) ("Generally, whether a particular condition constitutes a defect is an issue of fact for the trial court.") (citing Duffy v. Boston, 175 N.E. 54, 55 (Mass. 1931)). Freeman argues that because Optim has failed to present any expert testimony supporting that a defect is present, the claim must fail. [ECF No. 47 at 16-19]. However, the alleged defect in this case—paint falling off plastic sheathing—is straightforward and falls within an average juror's everyday experience. See Berezin v. FCA US, LLC, No. 21-10852-FDS, 2023LEXIS 213030, at *9 (D. Mass. Nov. 30, 2023) ("Assessing such plainly observable issues as paint quality and panel alignment is well within the realm of everyday experience and does not require specialized expertise.").

In addition to the question about the existence of a defect, there is also a factual question about whether such defect is attributable to Freeman. Optim argues that their investigation revealed that Freeman's sheathing was the reason that paint was not sticking. [RSOF ¶¶ 40, 89]. However, Freeman highlights that after it provides the sheathing to Optim, Optim engages in its own manufacturing process, altering the sheathing. [Id. ¶ 7]. Optim also then sends its altered product

10

to a third-party painting company who paints and further alters the product. [Id.] Therefore, the evidence presented can allow a jury to determine either way whether the paint falling off was caused by Freeman.

This Court finds that there is a factual dispute as to whether defects existed or whether the defects were attributable to Freeman's conduct. Thus, summary judgment as to the breach of contract claim is denied. See Marcus, 2000 WL 121783, at *3 ("Because there is a factual dispute over whether defects existed, however, summary judgment will not be granted.").

### B.   Breach of Warranties

#### 1. *Breach of Express Warranty (Count II)*

Optim further contends that summary judgment must enter in its favor on its breach of express warranty claim. To succeed in a claim of breach of express warranty under Massachusetts law, a plaintiff must demonstrate that the defendants failed to provide a product "that meets a standard of performance allegedly promised by the defendants." Jackson v. Johnson & Johnson, 330 F. Supp. 3d 616, 627 (D. Mass. 2018) (quoting Anthony's Pier Four, Inc. v. Crandall Dry Dock Eng'rs, Inc., 489 N.E.2d 172, 175 (Mass. 1986)). "Because the standard is set by defendant's express promises to the plaintiff, 'the plaintiff must demonstrate that the defendant promised a specific result' and that the defendant failed to deliver on his promise and, therefore, breached the express warranty." Id. (quoting Anthony's Pier Four, Inc., 489 N.E.2d at 175).

Here, Plaintiff advanced two promises that the Defendant made to them. First, Plaintiff relies on the express warranties found in their purchase order, which this Court found binding on the Defendants, see supra, to argue that such statements contained in the purchase order create express warranties that Freeman had to abide by. [ECF No. 35 at 13-14]. Plaintiff also advances Defendant's Certificate of Compliance. [Id.] Both of these warrant that the products would be free

11

from defects. Accordingly, to succeed on a breach of express warranty claim, Optim must have proven that Freeman failed to deliver a product free of defects. As discussed supra, there is a factual dispute as to whether "defects" existed or whether such defects were attributable to Freeman. See Marcus, 2000 WL 121783, at *3 ("Generally, whether a particular condition constitutes a defect is an issue of fact for the trial court.").

Furthermore, there is factual dispute as to whether Optim could have reasonably relied on the statements made by Freeman considering previous communications. Specifically, Freeman provided Optim with disclaimers that it was unable to "guarantee yield, quality or any production of any material" on their orders. [RSOF ¶ 19]. When a defendant's disclaimer conflicts with other written statements, the conflict "should place petitioner on notice that he should not rely on either statement. Confronted by such a conflict a reasonable person investigates matters further; he receives assurance or clarification before relying." AcBel Polytech, Inc. v. Fairchild Semiconductor Int'l, Inc., 928 F.3d 110, 125 (1st Cir. 2019) (quoting Trifiro v. N.Y. Life Ins. Co., 845 F.2d 30, 33 (1st Cir. 1988)). "Explicit conflict engenders doubt, and to rely on a statement the veracity of which one should doubt is unreasonable." Id. (quoting Trifiro, 845 F.2d at 34) (emphasis in original). Optim contends that it was not unreasonable to rely on Freeman's warranties because the disclaimers only applied to certain orders apart from the ones Optim is seeking relief for. "Whether [Optim] in fact relied on [Freeman]'s representations, and whether any such reliance was reasonable, are questions that are properly for the jury and that will depend for their resolution on the jury's evaluation of all the facts and circumstances." Nova Assignments, Inc. v. Kunian, 928 N.E.2d 364, 369 (Mass. App. Ct. 2010).

Because there are factual disputes to essential elements, summary judgment is denied as to the breach of express warranty claim.

### *2. Breach of Implied Warranty of Merchantability (Count III)*

Optim also contends that Freeman has breached its implied warranty of merchantability in supplying defective sheathing, and as such, summary judgment must enter in its favor. To succeed in a claim of breach of implied warranty of merchantability under Massachusetts law, a plaintiff must demonstrate "that 1) defendant manufactured or sold the subject product, 2) that product contained a defect or unreasonably dangerous condition rendering it unsuitable for its ordinary use, 3) plaintiff was using the product in a manner that defendant intended or reasonably could have foreseen and 4) the defect or dangerous condition was a legal cause of plaintiff's injury." Zoll Med. Corp. v. Barracuda Networks, Inc., 565 F. Supp. 3d 101, 107 (D. Mass. 2021).

Here, there is no argument that the Defendant manufactured or sold the product. However, as to the second element, Optim only alleges that the "sheathing was not merchantable and was not reasonably suited for its intended use insofar as paint, markings and numbering required in the design and specifications for the Optim tubes could not be applied and did not adhere to the surface of the sheathing." [Compl. ¶ 105]. The Complaint fails to allege any ordinary use of the sheathing. [See generally Compl.] Ordinary use includes "uses which the manufacturer intended and those which are reasonably foreseeable." Back v. Wickes Corp., 378 N.E.2d 964, 969 (Mass. 1978). Even reading the Complaint favorably, it alleges that the sheathing was used as a component of the X-7 tube that would ultimately be inserted into the human body. [RSOF ¶ 4]. There was no evidence presented that would allow the Court to infer that the sheathing would be incapable of being shaped into the X-7 tube or otherwise unfit to be placed inside the human body. [See RSOF]. The evidence also does not establish that the sheathing must be capable of being painted to be effective in its ordinary use. [See RSOF]. Instead, the Plaintiff alleges that the "defect" made the sheathing incapable of being painted in the way that Optim requested. [Compl. ¶ 105]. Plaintiff's

allegation in its claim for Breach of Implied Warranty of Fitness for a Particular Purpose, discussed infra, similarly states that the sheathing was unfit for the "known requirements" provided by Optim because it was unpaintable. [Compl. ¶ 114].

Plainly put, Optim alleges that the product was unfit to be used in the way Optim informed Freeman it intended to use it, i.e., by painting on it. These allegations cannot support a finding that the product was unfit for its "ordinary use." See Softub, Inc, 53 F. Supp. 3d at 255 n.13 ("Presumably, Softub's use cannot be both 'particular,' as is required to trigger the implied warranty of fitness for a particular purpose, and ordinary, as to trigger the implied warranty of merchantability."). Therefore, because Plaintiff has failed to allege an "ordinary use" and because Plaintiff's only alleged use is that of a particular purpose, summary judgment is granted against Plaintiff.[3]

### 3. Breach of Implied Warranty of Fitness for a Particular Purpose (Count IV)

As discussed, Plaintiff not only contended that Freeman has breached its implied warranty of merchantability in supplying defective sheathing, but that such conduct also breached its implied warranty of fitness for a particular purpose. "The warranty of fitness for a particular purpose is similar to the warranty of merchantability but applies only 'where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods.'" Pub. Serv. Mut. Ins. v. Empire Comfort Sys., Inc., 573 F. Supp. 2d 372, 381 (D. Mass. 2008) (quoting Mass. Gen. Laws ch. 106, § 2–315). "A 'particular purpose' differs from an 'ordinary purpose' in that it 'envisages a specific use by the buyer which is peculiar to the nature of his business.'" Id. (quoting Mass. Gen. Laws ch. 106, § 2–315).

---

[3] Fed. R. Civ. P. 56(f)(1) ("[T]he court may grant summary judgment for a nonmovant[.]").

Here, the record contains evidence of a factual dispute surrounding this issue sufficient to render summary judgment inappropriate. First, a genuine issue of fact exists as to whether Freeman had reason to know that Optim was relying on Freeman's skill or judgment in selecting the goods. Freeman contends that it had no reason to believe that Optim was relying on Freeman's judgment because Freeman was unaware that Optim was going to use the sheathing to have it painted. [RSOF ¶ 2]. Freeman argues that it could not have known that the sheathing would be painted on because such work was outsourced to a third-party. Plaintiff argues that it informed the Defendant the particular purpose it was requesting the sheathing. [Id.] Based on the evidence presented and the fact that Optim outsourced some of the work after acquiring the sheathing, a reasonable fact finder could find that Freeman was unaware of the particular purpose that Optim needed the sheathing for.

Second, as discussed supra, there is factual dispute as to whether Optim could have reasonably relied on the statements made by Freeman considering the conflicting communications. "Whether [Optim] in fact relied on [Freeman]'s representations, and whether any such reliance was reasonable, are questions that are properly for the jury and that will depend for their resolution on the jury's evaluation of all the facts and circumstances." Nova Assignments, Inc., 928 N.E.2d at 369.

Finally, as discussed supra, a reasonable fact finder could conclude the paint's inability to stick was not defect or that such defect was not attributable to Freeman. See Marcus, 2000 WL 121783, at *3 (Mass. Dist. Ct. Jan. 25, 2000) ("Generally, whether a particular condition constitutes a defect is an issue of fact for the trial court."). Therefore, summary judgment is denied as to the breach of implied warranty of fitness for a particular purpose claim.

## C.   Negligence and Negligent Misrepresentation

### *1. Negligence (Count V)*

Plaintiff's claim for negligence revolves around the same alleged misconduct surrounding the breach claims. Under Massachusetts law, it is "a well-settled proposition that actions for negligence and for breach of warranty impose distinct duties and standards of care." Haglund v. Philip Morris, Inc., 847 N.E.2d 315, 322, n.9 (Mass. 2006) (quoting Colter v. Barber-Greene Co., 525 N.E.2d 1305, 1313 (Mass. 1988)). "The basic elements of a products liability action founded on negligence are duty, breach of duty, cause in fact, and proximate cause." Colter, 525 N.E.2d at 1313. Unlike breach of warranty, in a negligence action, "the conduct of the defendant takes center stage, and liability will be imposed where the defendant has failed to use reasonable care to eliminate foreseeable dangers which subject a user to an unreasonable risk of injury." Haglund, 847 N.E.2d at 322, n.9 (quoting Colter, 525 N.E.2d at 1313). However, under Massachusetts law, a "defendant cannot be found to have been negligent without having breached the warranty of merchantability." Cipollone v. Yale Indus. Product, Inc., 202 F.3d 376, 379, n.3 (1st Cir. 2000) (quoting Hayes v. Ariens Co., 462 N.E.2d 273, 275 (Mass. 1984)).

Because the Court has entered summary judgment as to the breach of implied warranty of merchantability against Plaintiff, the Court also grants summary judgment against Plaintiff as to the negligence claim.[4] See id. ("Our conclusion that there is no breach of warranty of merchantability justifies summary judgment on Cipollone's negligence claims against Yale as well.").

---

[4] Even if this Court had found that the breach of implied warranty of merchantability survived, the negligence claim would have still failed because of the "'economic loss rule,' under which 'purely economic losses are unrecoverable in tort and strict liability actions in the absence of personal injury or property damage.'" See Rule v. Fort Dodge Animal Health, Inc., 604 F. Supp. 2d 288, 292-93 (D. Mass. 2009) (holding that "products liability claim based on negligence is barred by the economic loss rule") (quoting FMR Corp. v. Boston Edison Co., 613 N.E.2d 902, 903 (Mass. 1993)).

### 2. *Negligent Misrepresentation (Count VI)*

Like the breach of express warranty claim, Plaintiff also contends that Defendants made negligent misrepresentations by representing that its sheathing would be "merchantable, well-made, not defective and fit for Optim's particular purpose," and failed to deliver on such statements. [Compl. ¶ 129]. To sustain a claim for negligent misrepresentation under Massachusetts law, "a plaintiff must show that the defendant: (1) in the course of its business, (2) supplied false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and (6) that it failed to exercise reasonable care or competence in obtaining or communicating the information." Cummings v. HPG Int'l, Inc., 244 F.3d 16, 24 (1st Cir. 2001) (citing Fox v. F & J Gattozzi Corp., 672 N.E.2d 547, 551 (Mass. App. Ct. 1996)). In general, negligent misrepresentation claims are treated as negligence actions, focusing on the degree of care exercised in making the statements. [Id. at 25]. Despite this emphasis, Massachusetts courts have allowed "[a]n exception to the [economic loss] doctrine permit[ing] recovery for economic losses resulting from negligent misrepresentation." [Id. at 24] (quoting Nota Constr. Corp. v. Keyes Assocs., 694 N.E.2d 401, 405 (Mass. App. Ct. 1998)).

Here, the record contains evidence of a factual dispute surrounding this issue sufficient to render summary judgment inappropriate. First, a genuine issue of fact exists as to whether Freeman truly provided false statements, i.e., whether they promised a product free from defect and then delivered a defective product. As discussed supra, there is a factual dispute as to whether defects existed. See Marcus, 2000 WL 121783, at *3 ("Generally, whether a particular condition constitutes a defect is an issue of fact for the trial court."). Second, there is also a genuine issue of fact as to whether Optim justifiably relied upon the information provided by Freeman considering

17

other contradicting information Freeman provided. See supra. "Whether [Optim] in fact relied on [Freeman]'s representations, and whether any such reliance was reasonable, are questions that are properly for the jury and that will depend for their resolution on the jury's evaluation of all the facts and circumstances." Nova Assignments, Inc., 928 N.E.2d at 369.

Finally, there is a genuine issue of fact as to whether Freeman failed to exercise reasonable care in its communication. Although Optim alleges that Freeman should not have warranted a product free from defects given their awareness of the issues in their manufacturing process, Freeman informed Optim of its manufacturing issues and its inability to "guarantee yield, quality or any production of any material" on their orders. [RSOF ¶ 19]. Optim argues that these communications did not apply to the transactions in question and is not evidence of reasonable care. However, this evidence could allow a jury to resolve the issues in favor of either side. "Massachusetts courts have expressed a strong preference that reliance, in the context of negligent misrepresentation claims, be determined by a jury, and not on summary judgment[.]" First Marblehead Corp. v. House, 473 F.3d 1, 11 (1st Cir. 2006). Because there is a genuine dispute of facts surrounding multiple essential elements, summary judgment is denied as to the negligent misrepresentation claim.

IV. **CONCLUSION**

For the foregoing reasons, Plaintiff's motion for summary judgment is **GRANTED IN PART and DENIED IN PART**. Summary judgment is denied as to Counts I, II, IV, and VI. Summary judgment will be granted against Plaintiff as to Counts III and V.

**SO ORDERED.**

Dated: March 28, 2025  /s/ *Margaret R. Guzman*
Margaret R. Guzman
United States District Judge

18